*In re* MARRIAGE OF JANICE L. AGAZIM, Petitioner-Appellee and Cross-Appellant, and JOHN A. AGAZIM, Respondent-Appellant and Cross-Appellee.

Second District   No. 2—88—0059

Opinion filed November 7, 1988.—Rehearing denied December 12, 1988.

James E. Mahoney, of Griffith & Jacobson, of Chicago (Irvin J. Jacobson, of counsel), for appellant.

Roger A. White, of Roger A. White & Associates, Ltd., of Lake Bluff, and Paul J. Bargiel, of Chicago, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

This is a second appeal in a divorce proceeding that was commenced in 1983. In *In re Marriage of Agazim* (1986), 147 Ill. App. 3d 646, this court reversed the trial court's judgment and held that the wife's interest in an apartment complex acquired during the marriage was marital property. The husband now appeals from the distribution of marital property as determined by the trial court on remand. We affirm.

John Agazim (John) and Janice Serafine (Janice) were married 11 years, from May 18, 1974, to May 14, 1985. Two children, Andrew and Erik, aged 8 and 11, respectively, were born of this marriage. In the original judgment for dissolution of marriage entered May 14, 1985, the trial court found that an interest in Whitehall Manor (Whitehall), a four-building complex which was part of a larger 18-apartment complex, was the separate property of Janice. On September 26, 1986, this court held that Janice's interest in the apartment complex was marital property, and this cause was remanded for a redetermination of an equitable distribution.

On December 22, 1987, the trial court entered its second supplemental judgment, which is the subject of this appeal. This judgment provided in pertinent part: (1) the marital residence, located at 740 South Ridge Road in Lake Forest, Illinois, has a $340,000 value as of date of dissolution of marriage with an existing first mortgage of $85,314; (2) the residence contains furniture and furnishings of $49,000; (3) that Janice's one-half interest in Whitehall is valued at $648,463, and that one-half interest is marital property; (4) the marital estate has a value of $952,463, which consists of Whitehall

($648,463), the net equity in the marital residence ($255,000) and the furniture and furnishings ($49,000); (5) the marital debts are approximately $112,000, leaving a net marital estate for distribution of approximately $840,000; (6) John has a net income of $30,000; (7) Janice's 1985 income from Whitehall was $80,000, and her 1986 income was $100,000; (8) Janice's 1985 expenses were approximately $4,300 per month and her 1987 expenses were approximately $5,000 per month; (9) John's 1983 income was $92,000 with cash payouts of $270,000 and a shortfall of $178,000; (10) John's outstanding loans for business purposes were $78,000, and his other debts were $34,000, for a total of $112,000; (11) Janice is 37 years of age and she has knee, foot, and ankle injuries; (12) any ownership interest in Whitehall by John would be clearly antagonistic to Janice as well as her father, Joseph Serafine (Joseph), "who would do all in his power to compete with the separate ownership interest and eventually drive those ownership interests into the ground and out of competition"; (13) Whitehall was primarily and substantially contributed from sources provided by Janice; (14) the equity in the marital residence was furnished by the joint efforts of the parties; (15) John has greater ability to acquire assets from "greater income producing capability" and "a skill or talent to borrow money"; (16) Janice has the ability to derive income from the apartment buildings; (17) John will receive 24% of the marital assets and the "lion's share" of the hard (liquid) assets; and Janice will receive 76% of the assets.

The trial court ordered that (1) John pay child support of $625 per month; (2) no maintenance be awarded to either party; (3) each party pay his or her own fees; (4) John provide insurance for extraordinary medical and dental expenses for the children; (5) Janice be awarded the entire interest in Whitehall, as well as $49,000 of personal property; (6) the marital residence be sold and John be awarded the first $225,000 and Janice the next $30,000; (7) Janice be given the option of buying the house from John for $225,000 within 60 days of the entry of the judgment for dissolution; and (8) John pay the $112,000 of marital debts.

In 1977, Janice and her sister, Karen Considine, each bought a one-half interest in Whitehall through articles of agreement with their father, Joseph, as seller. Whitehall was part of an 18-building apartment complex owned and operated by Joseph. Neither Janice nor her sister paid any money down for the property. All payments for Whitehall were made with rental income from the apartments. Joseph continued to manage the property; he received from the rental income a management fee of between $1,200 and $1,600 per month. On or

about February 24, 1987, Joseph sent a notice of declaration of forfeiture to Karen Considine and Janice. The declaration stated that Joseph had elected to declare the agreement "null and void as of March 31, 1987, and the interest of the Purchasers in said apartment buildings, by virtue of said Articles of Agreement, forfeited and determined." No notice was sent to John, even though the supposed basis for the forfeiture was that there had been a forbidden transfer to John.

The only claimed basis for Joseph's declaration of forfeiture was that this court's decision in the first appeal, classifying Janice's interest in Whitehall as marital property, violated the following provision of the agreement:

> "The Purchasers shall not transfer, pledge or assign this Agreement, or any interest herein or hereunder without first obtaining the prior written consent of the Seller; nor shall the Purchasers lease said premises or any part thereof for a period greater than two (2) years without first obtaining the prior written consent of the Seller. Any violation or breach or attempted violation or breach of the provisions of this paragraph by Purchasers or any acts inconsistent herewith, shall vest no right, title or interest herein or hereunder or in the said real estate or in any such transferee, pledge, assignee or lessee, but Seller may, at his exclusive option, declare this Agreement to be null and void and invoke the provisions of this Agreement relating to forfeiture hereof."

After declaring the forfeiture, Joseph replaced Janice's lost income by advancing her loans to cover living expenses. Joseph advanced Janice an average of $9,000 per month after the purported forfeiture.

John learned of the declaration of forfeiture for the first time on October 1, 1987, when Janice testified during a hearing on the equitable distribution of marital property. On October 7, 1987, the trial court granted John leave to file a supplemental and third-party complaint, joining Joseph as a defendant and alleging that the purported forfeiture was a sham and a fraud. Proceedings in the third-party action have been stayed pending the outcome of this appeal.

On appeal, John argues that (1) the marital interest in the apartment complex was purchased entirely with marital funds; (2) the trial court erroneously considered the interests and motives of Joseph in awarding Janice the entire marital interest in the apartment complex; (3) the trial court abused its discretion in awarding John only 13% of the net marital estate; and (4) the trial court should be directed to

consider increased property values upon remand.

Janice cross-appeals, arguing that (1) she did not receive the marital property actually awarded her and is entitled to a larger share of the remaining marital property; and (2) the trial court should have permitted the parties' minor children and her to occupy the family home for a longer period of time before requiring its sale.

■ At the outset, we note that it is axiomatic that the trial court's distribution of marital property rests within its sound discretion and will not be disturbed absent an abuse of that discretion. (*In re Marriage of Los* (1985), 136 Ill. App. 3d 26.) Such an abuse of discretion occurs only where no reasonable person would take the view adopted by the court. 136 Ill. App. 3d 26.

■ John initially argues that the marital interest in Whitehall, the contested apartment complex, was purchased entirely with marital funds to which he substantially contributed. John points out that Janice paid no money down for Whitehall and played no part in the complex' management, which was handled by her father, and that all payments of principal and interest were paid with rental income from the apartments. John contends that income from marital property is not among the statutory exceptions and is, therefore, marital property itself. Ill. Rev. Stat. 1987, ch. 40, par. 503(a).

John further notes that in his first appeal, Janice argued strenuously that she made no contribution to the acquisition of Whitehall. Having argued so forcefully that she made no contribution to Whitehall's acquisition, Janice cannot now claim she made a substantial contribution to acquiring Whitehall.

Citing *In re Marriage of Morse* (1986), 143 Ill. App. 3d 849 (the wife, who worked from one to three hours per day in husband's nonmarital insurance agency, made no substantial contribution to said property), John argues that the trial court abused its discretion in finding that Whitehall was contributed primarily and substantially by Janice. Janice argues that the record shows no evidence that John made substantial contribution to Whitehall's being part of the estate. Moreover, Janice contends that John cannot have it both ways, *i.e.*, arguing in the first appeal that Janice had provided substantial consideration in the purchase of Whitehall and now argues that she made no substantial contribution to its acquisition.

■ We find that, but for Janice's contribution to Whitehall, the apartment complex would not be a part of the marital estate. There is no evidence to support John's contention that he made a substantial contribution to Whitehall. As we stated in the first appeal, the sisters, Karen Considine and Janice, were responsible for the mortgage pay-

ments, and they were paying for the property out of Whitehall's rental proceeds. (*In re Marriage of Agazim* (1986), 147 Ill. App. 3d 646, 649.) Janice obviously made the sole contribution to Whitehall's acquisition. Therefore, the trial court did not abuse its discretion in awarding Janice the complete interest in Whitehall.

∎ Next, John argues that the trial court abused its discretion in awarding him only 13% of the net marital estate. Pursuant to section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1985, ch. 40, par. 503(d)), a trial court is required to divide marital property in " 'just proportions,' taking into consideration eleven enumerated factors." (*In re Marriage of Frazier* (1988), 164 Ill. App. 3d 207, 210.) Decisions construing the Act have established that an equitable division of marital property is not necessarily an equal one and the court can properly award one spouse a greater share where the relevant factors warrant that result. (*In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256.) The touchstone of apportionment of marital property is whether the distribution is equitable in nature; mathematical equality is not required, and just proportions do not mean equal amounts. *In re Marriage of Wade* (1987), 158 Ill. App. 3d 255.

∎ Moreover, the trial court's distribution of marital property rests within its sound discretion and will not be disturbed on appeal, absent an abuse of discretion. (*In re Marriage of Los* (1985), 136 Ill. App. 3d 26.) The trial court's discretion, however, is not unlimited. A division of property must be reasonable and must meet the statute's objectives. (*In re Marriage of Fryer* (1980), 88 Ill. App. 3d 454.) The statute's objectives are twofold. First, the disposition should recognize the contribution of each party to the marriage and should compensate that party. (*In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673.) Second, the distribution should place each party in a position to begin anew. 121 Ill. App. 3d at 678.

John maintains that he received 13% ($143,000) of the *net* estate. This figure represents the gross amount he was awarded ($255,000), minus the marital debts of $112,000, which the court ordered him to pay. He points out that he received this net award despite his contribution of being the principal wage earner during the 11-year marriage. Further, he must pay 25% of his annual income for child support.

John contends that reviewing courts have repeatedly reversed disproportionate distributions, *e.g.*, *In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, and *In re Marriage of Hobbs* (1982), 110 Ill. App. 3d 451. He admits that some disproportionate property awards have

been affirmed, but only in cases that involved extraordinary circumstances, *e.g., In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881 (dissipation of assets by one spouse); *In re Marriage of Clearman* (1981), 97 Ill. App. 3d 641 (deterioration of one spouse's health). No such factors are present in this case, John insists.

Janice initially responds that the debts were incurred by John for his own purposes. The court found that the evidence demonstrated that all of the marital debts were John's personal liabilities. Further, Janice likens the instant case to *In re Marriage of Ryan* (1985), 138 Ill. App. 3d 1077, where the court held the husband solely responsible for a $103,000 debt. The *Ryan* court found that the overwhelming majority of debts was created by the husband and that additional support for the allocation of debts was the husband's substantially greater earning capacity.

Janice cites a number of cases that uphold awards as similarly disproportionate as the instant action. *E.g., In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881 (90% of marital property to wife was not an abuse of discretion); *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017 (63% of marital property to wife was not an abuse of discretion).

Finally, Janice contends that the statutory factor that most often impacts the distribution of property is one spouse's superior earning ability. (*E.g., In re Marriage of Lord* (1984), 125 Ill. App. 3d 1; *In re Marriage of Stephenson* (1983), 121 Ill. App. 3d 698.) Janice points out that she was found to have, and does have, a substantially inferior earning capacity than John and that she has received no maintenance from him. She argues that under these circumstances, the trial court was within the bounds of its bounds of discretion in awarding Janice a larger share of the marital property.

█ We agree with Janice. As John admits, he was the principal wage earner throughout the marriage. Janice's wage earning capacity appears quite limited. The skill she has, *i.e.,* teaching ice skating, is evidently hampered by knee, foot, and ankle injuries. The trial court correctly found that John had a greater ability to acquire assets from "greater income producing ability" and "a skill or talent to borrow money." Because of this disparity in employment capacities, the court could reasonably fashion a disposition that awarded a majority of marital assets to Janice. Also, the evidence fully supports the trial court's finding that the marital debts were solely incurred by John for his personal purposes.

Next, we address John's assertion that the trial court erroneously considered the interests and motives of Janice's father in awarding

Janice the entire marital interest in the apartment complex. The trial court found that "John's interest in having any part of the four apartment buildings is clearly antagonistic not only to Janice, but to the remainder of the complex, namely Mr. Joseph [Serafine]. *** From the evidence shown at the first trial, basically through Mr. Joseph [Serafine], there was simply too much to lose by suggesting an award for establishing a separate sale and ownership of the four apartment buildings; this would be true if it were awarded to John to establish separate ownership or if this Court should order the sale of that apartment building." John argues that in light of Joseph's antagonism, the trial court could have fashioned an award that avoided giving John a permanent interest in Whitehall while providing an alternate means of distributing the marital property, *i.e.*, offsetting payments. *In re Marriage of Banach* (1986), 140 Ill. App. 3d 327.

■ As we have stated above, the trial court did not abuse its discretion in awarding Whitehall to Janice and thereby awarding her 76% of the marital property. Thus, John's argument for offsetting payments must fail. Further, we do not find that the trial court put an inordinate emphasis upon Joseph's hostility to John's having a permanent interest in Whitehall. Said antagonism was but one element that influenced the trial court's distribution of marital property. There is no evidence that the court placed any undue or even primary emphasis upon this factor, which was reasonably one of the concerns the court had to address in reaching its decision. Moreover, the trial court should seek a high degree of finality, so the parties can plan their futures and will not be encouraged to return to court. *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452.

■ On cross-appeal, Janice initially argues that she did not receive the marital property actually awarded to her and is entitled to a larger share of the remaining marital property. In as interesting a computation as the one John applied to the numbers involved here, Janice maintains that she was, in fact, awarded 26% of the marital property. She arrives at this figure thusly. Whitehall was withdrawn from the marital estate by her father. The withdrawal decreased the total value of the marital property to $304,000, of which $79,000 (or 26%) was awarded to her in the form of $30,000 equity in the house and $49,000 of furnishings.

Janice surmises that the trial court's view that Whitehall was a part of the marital property could have arisen from one of two reasons. Either the court considered the forfeiture of Janice's interest in Whitehall a sham, or it may have treated Janice's failure to contest the forfeiture as a dissipation of marital assets.

The trial court's reasoning regarding this matter is unclear. Addressing the alleged forfeiture of Whitehall, the court stated:

"In terms of preservation or dissipation, Janice can arguably be held to have allowed the forfeiture, if valid, to have perceived [*sic*, proceeded] without any notice to John; at least, one reviewing court in the Second District and in a recent case has found this to constitute either dissipation or, at the very least, failure to preserve a marital asset, and that case was the *Aslaksen* case, *** found at 148 Illinois Appellate 3d 784."

Later the court appeared to discount the apparent dissipation of marital assets and viewed it as a part of the marital estate when it stated the following:

"[I]t's time that the parties consider laying down awards and resolving whatever differences may appear to obstruct final resolution. There are still 2 children to take care of, John has a second family, and Janice has her immediate family, *together with working with her father to preserve her awarded asset of the apartment building.*" (Emphasis added.)

The trial court evidently concluded that Janice, for all intents and purposes, still owned 50% of Whitehall, the reference to *In re Marriage of Aslaksen* (1986), 148 Ill. App. 3d 784, notwithstanding.

As noted above, Joseph is loaning Janice, on average, $9,000 per month. It is difficult for us to see how Janice could ever afford to repay said loans without owning a half interest in Whitehall. Her wages as an ice skating instructor would probably not suffice. If Joseph had been serious about cutting Janice completely off from Whitehall, he would have made no provisions to pay her loans totaling approximately $108,000 per year. The court could reasonably infer from the facts that the loans were meant to tide Janice over until Whitehall was safely out of John's grasp. The trial court did not abuse its discretion in treating Whitehall as part of the marital estate.

■ Next, Janice argues that she should be allowed to occupy the family home for a longer period of time before requiring its sale. The trial court ordered that the parties list their marital home for sale and that, after paying off the mortgage of $85,314 and the sale expenses, the parties divide the net sales price with $225,000 to John and $30,000 to Janice, or in the alternative, that Janice purchase John's interest in the residence for $225,000 to be paid within 60 days of the entry of a judgment for dissolution.

Janice notes that the Act provides that the "desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children." Ill. Rev. Stat.

1987, ch. 40, par. 503(d)(4).

Specifically, Janice wants to stay in the marital home until Andrew, who is now eight years of age, graduates, at age 14, from Lake Forest's Country Day School, where both her children receive the special attention they purportedly need. Janice asserts that the divorce has had and will continue to have an adverse effect on the children; they have suffered severe emotional disruption caused by the separation of their parents. She contends that the boys need continuity in their environment to reduce the lasting impact. Dr. Katie Gniepp, a court-appointed psychologist, testified that it is desirable for Erik and Andrew to remain in the family home.

Janice cites a number of cases in support of this argument. In *In re Marriage of Woolsey* (1980), 85 Ill. App. 3d 636, the husband contended the family residence should be sold at the time of the dissolution of marriage so that he could receive a portion of the proceeds therefrom. The court rejected the husband's contention and allowed the wife and children to remain in the family home until the youngest child reached majority—a period of nine years. The trial court in *In re Marriage of Thompson* (1979), 79 Ill. App. 3d 310, permitted the wife and children to remain in the family home until the youngest child attained majority, a period of seven years.

In *In re Marriage of Brenner* (1981), 95 Ill. App. 3d 100, the trial court ordered that the family home be sold at the time of the dissolution of the marriage and the proceeds from the sale be divided between the parties after the husband received certain credits based on mortgage payments he had made. On appeal, the wife contended that she should be permitted to remain in the family home until the youngest child (age 12 at the time of trial) reached majority. The appellate court agreed with her and stated:

> "Section 503(c)(4) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)(4)) provides that the 'desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children' is a relevant factor in dividing marital property. The adverse effect which dissolution of a marriage has on children is self-evident. Therefore, where possible, children should be afforded continuity in their environment in order to reduce the emotional disruption caused by the separation of their parents. One of the ways this can be accomplished is by affording the children continued residence in the family home." 95 Ill. App. 3d at 102.

John argues that the desirability of keeping the children in the

marital home is but one of many factors to be considered in distributing the marital property. After distinguishing the cases cited by Janice, John cites *In re Marriage of Smith* (1981), 100 Ill. App. 3d 1126, where the trial court ordered the immediate sale of the home to give the husband sufficient funds to pay child support while providing for his own needs. In *Smith*, the court held that the trial court's decision was reasonable and consistent with Act's goals of providing for the financial needs of the spouses by property division. 100 Ill. App. 3d at 1131.

John contends the need to sell the marital home is compelling because of the substantial marital debts and his precarious financial circumstances. He further asserts that Janice has exaggerated the children's needs to remain in the marital home. Contending there is no evidence that a move to another home will harm the children, John opines that, if Janice wants the children to continue at Country Day School, she can move to another residence in or around Lake Forest.

We agree with John that the record does not indicate that the trial court's decision was arbitrary or that "no reasonable man would take the view adopted by the trial court." (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127.) Keeping the children in the marital home is but one factor to be addressed in distributing the marital property. Here that factor was clearly outweighed by the need to give John sufficient funds so that he could pay child support, provide for his new family's needs, and pay off his outstanding debts. Specifically, it appears that John would have difficulty in paying the child support payments, on his business income alone. Moreover, there is no evidence that Janice cannot relocate in the Lake Forest area and continue to send the children to Country Day School. Accordingly, we find that the trial court did not abuse its discretion by ordering the sale of the marital home.

Finally, because we affirm the trial court's decision, we do not need to address John's concluding argument that, upon remand, the trial court should be directed to consider the increased property values.

For reasons stated above, we affirm the decision of the circuit court.

Affirmed.

NASH and REINHARD, JJ., concur.